With that, I'll ask the clerk to call the first case. Case number 10-3380, Linda Ruhl v. Illinois State Board of Education. Good morning, Your Honor. Elaine Siegel for the plaintiff at the lead, Linda Ruhl. Lee Robert on behalf of the Appellate Chicago Board of Education. Okay, and I think the Board of Education is the appellant here based upon the Intermediate Court of Appeals, which in this case was the Circuit Court. While you would have been the appellant had this appeal been taken directly from the administrative proceeding. Yes, correct. Okay, so with that, we'll invite you, Ms. Siegel, to take your seat while you may then proceed. The appellant, in this case, may proceed when ready. Your Honor's counsel, may it please the clerk. To frame this issue, I'd like you to think of yourself as a, think of your seven-year-old self. Well, I don't know, two responses to that. First of all, it's not that hard for any of us to be children. Secondly, I don't think that that's particularly relevant since we're not children. We're here to determine what the issues of law compel as a result. Your Honor, I want to address two issues. One, that Mrs. Ruhl received all of the due process she was, she received all of the process she was due. And second, that the jury. Is that correct? Yes, Your Honor. Is the confrontation, a right to confront your complaining witnesses, since this isn't a criminal case, we won't say your accusers, guaranteed in an administrative proceeding or not? Isn't that a fundamental issue? And don't we have cases going either way? Well, I think the cases that go our way are Dukerin, one of the most recent first district cases, where the statements of medical students, much older than the seven-year-old here, were accepted, a hearsay statement. We have, in Colquitt, that was the case I suppose that's maybe very relevant here, that's an expulsion case. The court said that there was a right to confront, but in that case, counsel for the child objected when hearsay was admitted. An assistant principal testified to three statements that were made by students. The counsel objected. What about Hearns, Bangler, and Bart, among others, that seem to presume that due process, at least the tenured teachers, and I presume that this teacher was tenured, is that correct? Yes, Your Honor. It includes the right of confrontation. Well, here there were three specifications, Your Honor. And Ms. Rule did have the right to confront one of her accusers, and that was Lloyd. And the hearing officer, whose job it was to determine credibility, found that Lloyd was more credible than Ms. Rule. I'm also curious in this particular case, what we do, even if the testimony of Brianna could be introduced through a medium rather than directly, what are we going to do with the recantation? How do we treat her testimony? Do we treat her testimony as recanted? And if so, under ordinary criminal law, there is a specific statute designed to control gang activity and protect against intimidation, which allows, under certain circumstances, for the hearsay of a recanted witness to be introduced. But what are we supposed to do here? We don't have Brianna in front of us. And yet, the testimony through the mother, what is that, is Mother Virgie? At first, seeks to inculcate the Ms. Rule, but then there's a recantation. How do we treat that? Now, you can claim from today until doomsday that that recantation was basically pressured and coerced and what have you. But as a rule of evidence, in terms of its evidentiary content, how is that to be treated on this case? Well, I have to say again that there was no objection when the assistant principal testified that Brianna told her that Ms. Rule hit her in the hip. And there was no objection when Detective Wiggins testified that Brianna told him that Rule hit her in the hip. So, in other words, it's a question basically of unobjected to hearsay being admissible vis-a-vis being hearsay. But what about its competence as evidence coming from a seven-year-old and being contradicted in fact by Lloyd and being recanted? Do we treat this evidence as competence? I believe you should treat it as competence. And I'll refer you to the Colquitt case. I have Colquitt cases. They talked about having hearsay being admissible in two situations. One would be where the witness was unavailable. And that's the situation here. Brianna was unavailable. Well, what do you mean? We have no – there's nothing in the record to indicate one way or the other that she was unavailable. Well, both counsels say – She didn't appear. She may have refused, but that doesn't constitute unavailability. Unavailability is a construct that covers situations of departures from the jurisdiction, maybe the taking of the Fifth Amendment, but not simply a refusal to appear. All right. Well, is there any case law that you would refer us to that says that the failure to answer subpoena means that the person is unavailable? No, Your Honor. All right. So we have this testimony that Justice Gordon asked us. Is it competence if there is no unavailability? Well, you've got hearsay that's not objective to enact. Counsel, maybe we can cut to the chase, if I may. And it's not that I – I struggled with this case, so I don't mind telling you. We all do. But let's see if we can narrow down the issues so that we get at least to the – some of the core issues that are troublesome. We have basically in this case to establish the specifications, which consist primarily of the corporal punishment charge. We have corporal punishment vis-a-vis Brianna and corporal punishment vis-a-vis Lloyd. The witnesses to this corporal punishment is limited solely in terms of in court, appearing in the court, to the testimony of Lloyd. The only other eyewitness disclosure of corporal punishment comes through the hearsay of Brianna. Lloyd is an ADDH victim, known according to testimony in the record as part of the symptomology to make up stories. Not necessarily making up this story. I'm not bottom lining this by any means. I would suggest nobody get their hopes up from my questions. I proceed by being devil's advocate. And so we have Brianna through her hearsay, and we have Lloyd through his direct testimony, each of which, they're both small children, one of them systematic with some problems that may, at least according to testimony, lead on occasion to imaginary testimony or made-up testimony. And the other is Brianna, and they're in contradiction to each other. Brianna testifies that she was slapped, and Lloyd testifying that he saw Brianna knocked to the ground and into the water cooler. So they don't agree on the facts of the case, but they're only two small children. There is no other testimony direct, and I venture to say indirect, establishing the corporal punishment. Now the question is, what are we to do with that under the procedural and substantive rules that guide us, and we know there's a manifest weight of the evidence vis-a-vis the administrator, if there's supporting evidence. Is there supporting evidence here, or is the circuit court, as the intermediate court of appeals, correct in its evaluation that this evidence is insufficient constitutionally? No, Your Honor, because the statute states, Section 3485 states that conduct on the part of the teacher that's cruel, immoral, negligent, criminal, or in any way causes psychological harm to a student, one student. That's what the statute says. Is there a mediable cause for this? Is there enough proof that such harm was perpetrated against one student? In this case, I presume you mean Lloyd. Yes, Your Honor. But he appeared in court. You're not, is that, are you giving up on Brianna? No, I'm not giving up on Brianna. What was the testimony about the harm? The harm to Lloyd? Yes. Was that he was put out of his class, his teacher elicited class hate. I guess what I'm asking was, apart from his testimony, was there other testimony about harm? Yes. The assistant principal, Everidge, testified that he was put out of his class, that he was shunned by his classmates, that she wouldn't let him participate. Was there testimony by Everidge about any kind of physical harm? Everidge's testimony is based upon reports from the child. Right. So, is that what you're saying, that her testimony was the support for the harm? Well, first it's cruel. First of all, you don't have to try to sell us on the notion that if a teacher, in any way, imposes corporal punishment on a child, there's harm. That's not, I wouldn't want to suggest that. Although there is still an issue there about remediability. Remediability, yes. Apart from that, there's a dispute about that. But you don't need to convince any of us that if a teacher imposes corporal punishment on a child, that there isn't harm. I mean, I can't speak for everybody else, but I think we'd all agree that if our seven-year-olds were, in any way, if there were truth to the allegations, that there's harm. That's not really where I'm headed here. In other words, there's no point, there's no need for you to spend any time to ingrain us with both the laws and, in human terms, the recognition that corporal punishment cries out for discipline. Okay. The issue in this case is not whether corporal punishment is a proper subject of discipline, including very likely termination, but the question is whether there is sufficient evidence for us as a reviewing court and going back down for the administrative agency to have reached the conclusion that there was, in fact, such corporal punishment. And that's where you ought to be spending your time, it seems to me, if I were in your shoes. Thank you, Your Honor. The hearing officers heard Lloyd testify, and she heard Rule testify. And she found that Lloyd was open and direct, and that he was consistent in the basic details of what was happening. Except that his testimony conflicted with the report of Brianna, who was the only other purported eyewitness. No, Your Honor. Except maybe for the students for those 12 letters. No, Your Honor. There were two other witnesses who talked to Detective Wiggins. They were not eyewitnesses. Yes, Your Honor. They were friends of the eyewitness. The children who were in the room when Lloyd testified. And again, they didn't testify. They didn't testify, but their testimony, what they said, wasn't objected to. But the hearing officer heard Mrs. Rule testify. And she said she found it unlikely that Arnie Duncan, Assistant Principal Everidge, Principal Briggs, you know, Virgie, Tamika, Lloyd, all of these would conspire against Lloyd, would conspire against Mrs. Rule. She found that improbable. Counsel, in the record, Mrs. Rule, according to the brief, sent a letter regarding his behavior that day to his mother. True? No, I believe that happened the next day. Is this December 11th? December 11th is when the incident occurred. In December 11th, the briefs indicate that Rule sent Lloyd's mother another of many reports about his hostile behavior, disciplinary code violations, that very day. Now, I think this is kind of critical. You're saying this letter wasn't from that day? No, I think it was dated that day, but I think it was sent to the principal the next day. Okay. The next day before the whole thing broke out? I think it was an email, so I'm not sure at what time it was sent. And then didn't the mother come in the very next day before this whole thing erupted and ask for him to be transferred again? No. What happened is the mother came in that morning and spoke with Assistant Principal Everidge and told her that Lloyd had come home and said that Rule hit him in the head. Yeah. So you're saying that it sounds like the teacher is perhaps trying to already put in place some kind of cover, and the mother's coming in the same day and she's already trying to put in place something that her son was hit. Did it all happen at the very same moment? But what I think happened is that Lloyd, his mother came and picked him up, and as soon as he came out of school... Well, that's what she testified to, that as soon as he came out of school, he said he had a bad day, and then he was hit. She didn't go back into the school. No. No. The next day she comes in and asks for her son to be transferred. Well, she came in and told the Assistant Principal that Lloyd had been hit. Wasn't this like the tenth time she asked to have him transferred to another room? I don't know if it was the tenth time. And didn't the principal say that we can't move him to another room unless a teacher is willing to accept him? That's what she said. And was there some reason that she would have said that? That because of his history, that no other teacher was willing to accept him in their classroom? Weren't there multiple documented incidents involving this particular child? Yes. Lloyd was a handful. That's what the different people testified to. But that doesn't mean that... No. She said again, that day, no one did anything about this. They did not move him out until the 13th, and then he was put back in the classroom on the 14th, and then he remained there until the hearing in March? I can't justify that. Well, isn't that what the record shows? Yes, Your Honor, and I can't justify that. That the school did nothing until March to begin this termination proceeding? That's right. We have 400,000 students and 35,000 teachers. Yes, but you don't have incidents of corporal punishment happening every single day, do you? Yes, we do. You do? Yes. And there's nothing done for months? Now, something happens better than happened at this time. But at that time, this wasn't handled correctly at all. How many did you say happened every day? Thousands? No, I did not. What did you say? I said we have situations of corporal punishment that happen almost every day. Yes. And what do they number it? Do you have any idea? I see probably three or four every day, and we have 400,000 students. I don't think it's for this court to… Can we get back to office? I know… It's not our position to re-weigh the evidence. No, we have to get background, however, so that we can then evaluate whether the credibility calls made by the administrative agency are so far-fetched that they don't satisfy the manifest way to the evidence. Okay? That's all we do in terms of our function legally here is to ascertain whether the credibility calls for which we defer to the agency were sufficiently grounded to satisfy the manifest way to the evidence. So that takes me back to what you were arguing about Officer Wiggins. He said he interviewed Rashiana, Karisma, and Brianna A., who was someone other than the Brianna who was the alleged victim in this case. Right. Okay. Now, do we have the full content of that testimony? None of these three students themselves appeared, right? Right. And Officer Wiggins, who was called by the administration of the school to make an arrest, refused to make the arrest based on that testimony, even though he had that testimony. No, Your Honor, that's not the case. Well, that's what I read in the brief. Detective Wiggins is an employee of the board, and he hired him as an investigator. Different officers came to the school. But they did not make an arrest. They did not. But getting back to the incident itself, the student said, I was slapped in the back of my head and knocked into this aquarium. Wiggins, your investigator, said that couldn't happen. Is that what happened? No, I don't think Wiggins said that wouldn't happen. I think the police who came to the scene that day said that that was unlikely, that if he'd bumped into the aquarium, it would have broken. But then he did change that. It wasn't an aquarium incident. He did change that. But he did originally tell Wiggins that he was bumped into the aquarium. No, I believe he told that to his mother. Oh, all right. So that actually fell apart. In other words, at some point, he recanted a fish tank incident. Right. Now, did he also say that he rang the buzzer or the alarm into the principal's office? He said he tried to. He tried to. He said he went to the intercom button and pressed it, yes. That's what he said. All right. And didn't the school witness from the school say that there was never any contact from that room to the office? Yes. All right. Did he ever back off that? Yes. Did he contact the office? No, he didn't. He was consistent in that. The hearing officer found that he was consistent in that detail. Did the hearing officer discuss that fact at all in her findings? Did she talk about whether or not there was contact made to the office by this child? She found that he was consistent in saying that that happened, so I suppose that we can infer from that that she didn't credit what the person in the office said. Okay. All right. Well, we don't have time for a rebuttal. You said there were two things you wanted to discuss. I don't mean to cut you short. No, that's fine. I wanted to talk about the manifesto aid, and I think that we got into that, because Lloyd's testimony, which was found to be credible, is sufficient for us to refer to. The problem here is both from the outside and from the due process issue that has to be determined and applied to these facts is that we don't have any direct testimony except through one problematic child, whose problems also, tangentially or otherwise, impact on the confidence or trustworthiness of the testimony, and the fact that everything else here comes in through hearsay and all through small children and all subject to internal inconsistencies. I'd like to just point out one thing. Mrs. Rule did admit, and in her testimony, She didn't remember is what she said. What she admitted to, Your Honor, was that when she was talking to the people in the classroom, the parents and the teachers, about Brianna's allegation that she hit her and telling her that she needed to be sure to tell the truth, she admitted that she did that. Now, is that a charge on which this particular board was allowed to act in this case? Yes, Your Honor, that was the third specification, that she pressured Brianna to recant. So I'd like for you to consider that she admitted that she did that. Well, unfortunately, the briefs spend very little time with that issue, don't they? Well, I did put it in there. I'm sorry I didn't emphasize it to the extent I should have. Your Honor, counsel, may it please the Court, I'd like to address immediately a couple of the issues that you have raised concerning the facts, and I know that this is a detailed case. There are lots of facts and inconsistencies and difficulties with the transcript. But I would like to point out- I hope when you discuss this that you will attempt to relate that to the standard which controls our review, namely the manifest weight of the evidence for which we don't look to the intermediate court, to the circuit court, but we look to the administrative agents. Yes, that's correct. I understand. Well, let's talk about the hearsay, because the board contends that you did not object to any of the hearsay that came in at the hearing. And generally speaking, when hearsay is not objected to, it is admitted- It can be- And considered and given its natural probative effect. It can be competent evidence. Yes, that's correct. It can be competent evidence under certain circumstances. It is absolutely incorrect that there were no objections made to the hearsay regarding the Breonna charges. There were objections made over and over again, and I'd like to call- Not to every instance in which that hearsay was announced. There may have been objections at some earlier time, and I don't recall the specific instances, but hearsay did slip through from those witnesses that was unobjected to, and there was no standing objection. Well, with respect to some of it, there were standing objections, and I'd like to point out that- Well, why don't I point that out, please? Sure. The board acknowledges that there were four pieces of evidence on which they relied concerning what I'll call the Breonna charges, number two and number three. And there was Lloyd's statement, and there was an incident report. There was a letter from Ms. Everidge. Those were three of the pieces. And at page C290 of the transcript, Board Exhibit 13, which is Virgie's report of the incident, the hearing officer ruled at that time, we don't know for sure whether or not she will in fact be a witness. I want to point out, by the way, that the subpoena- the board did nothing to try to enforce that subpoena. There was some callously on the record indicating that they made a phone call. So are you saying at that point there was an objection, and the hearing officer ruled that since we don't know whether Virgie's going to be here, I'm overruling the objection at this time? She said, I can be a little more specific, she said, I will allow this in based on the testimony of this witness that she saw it being written. And it comes from the documents of the school district. I will reserve judgment on the weight that I give to it after we get all the witnesses in and you- So what about that exception to the hearsay rule that these statements were coming in under the business records exception? Well, they can't come in under the business records exception because they don't meet the standard that the Supreme Court has enunciated in People v. Smith. And that appears at 141 Illinois Report 2nd at, I believe, 40. Let's go further. Where did you object to this later testimony? The testimony about Virgie? Actually, I did not represent the plaintiff. Where did your client object to it? Yes, the client objected repeatedly. Actually, let me find the transcript sites here. There was a cross-examination. I've cited to Record C-290. Like when Wiggins, did he actually testify or was it more his paper report? I don't recall. Wiggins actually testified. When he testified, was there an objection registered when he began recounting what Brianna had reported? No, what those other children reported in addition. Here are a couple of things, and I think there are two things that need to be brought out. And first I will respond to your question. There's another aspect of Mr. Wiggins' report that I think needs to be considered. First is that this is an administrative proceeding in which the hearing officer takes a very last view toward the admission of evidence. The hearing officer stated in the course of the proceedings that she almost never rules out any evidence that's offered. At the beginning, and it was C-237 and following the transcript, as Detective Wiggins was beginning his testimony, there's a lengthy discussion on the record of hearsay and whether or not it's admissible in administrative proceedings. There are three documents that they're talking about. Number two is the Wiggins report, and then number three is the incident report for Cone School, and four is the letter of Brianna's mother. The initial one where she was talking about whether she was slapping her hand or was it her head, she can't tell from that document. So Rural Council raises a detailed hearsay objection at that point, and he speaks to documents three and four. And the hearing officer admits those two documents, and again that's the letter from Bridget's mother and the school's incident report. And in the letter, it's your contention that it's based upon the written word. It's not actually possible to tell whether the child was reporting a hit on the hand or a hit on the head. It looks like hands because the child is first saying, you know, in this. Yeah, but either way, you can't really tell for sure, but this was evidence that the hearing officer certainly considered. It was evidence that the hearing officer considered, and the hearing officer actually resolved that question as to whether or not it was a hit on the head or a hit on the hand, based on what she thought probably the child was saying to the mother. But do you believe there's a clear objection on the record to those three pieces of documentation? There's four. Let me be a little more clear about this. The three and four are admitted by the hearing officer at that point, and she explicitly says that they come in for the truth of the matter asserted. So she's expressly admitting hearsay at that point. The board doesn't move number two into evidence. The hearing officer brings three and four into evidence, but the board doesn't move number two. And they say they're going to bring it in at the end of the board's case-in-chief. And actually, they do it just a little bit earlier. And the hearing officer says that admissibility decisions would be reserved to and made at that later point. And that's at C-288 and C-331-32. Now, at 32, C-332, the hearing officer goes back over the documents. Now, at the time that three and four were under discussion, two was just about to come in. And that's the investigative report of Detective Wiggins. And so when it comes to admitting a large group of documents in, rule counsel makes global objections at that point. He renews all of his prior objections. And as I said, the hearing officer said that it's rare that she excludes evidence. That's at C-367 of the proceedings. And I will say that this is common practice in a lot of school proceedings where you have, like this hearing officer here, and I've been involved in maybe 25, 30 school cases like this administrative proceeding, the hearing officer has let everything in. There are objections here and there. They're scattershot. They're not resolved. The hearing officer will say, well, how does that help us? Are you trying to tell us that because of the looseness of that procedure, we need not be guided by the fact as to whether proper objections were made to the introduction of hearsay? Your Honor, what I'm saying is that... Is that what you're trying to convey? No, sir. What I'm trying to say is that given the way that these standards are applied and given the fact that the Illinois State Board of Education regulations provide that strict rules of evidence don't apply, to the extent that you're going to apply rules of evidence, you've got to do it in a way that doesn't deny due process to the, in this instance, the accused. Both parties have to... The question now is whether, first of all, under the rules of evidence without referring to the confrontation clause of the Constitution, but just as an evidentiary rule, if no objection is made to evidence before a court, forget that it's an agency, to a court that is bound by, will that court nevertheless be prohibited from utilizing that hearsay if it's otherwise competent? No, not a court. And likewise the administrative agency, regardless of the looseness of its procedures. If counsel is misled into foregoing the making of objections, will the agency nevertheless be precluded from utilizing the hearsay that comes in? Yes, I believe that where it rises to the level that it becomes a due process violation, I think... Well, I set up a hypothetical here where I excluded the due process issue. And that's what hypotheticals are for. They don't permit the attorney, as capable as they are, to sidestep the question. And my question is under the rules of evidence. Forget putting aside a constitutional consideration. Will the looseness of the procedures preclude the administrative agency under the rules of evidence from utilizing that hearsay? Under the rules of evidence, you have to have indicia of reliability. Well, I said otherwise reliable. All right. I guess what I'm saying is that under the rules of evidence, in a court, acknowledge that under the rules of evidence, if you don't object and it comes in... And likewise in an administrative agency. Now, I believe it's different because the administrative agency forswears reliance on strict rules of procedure. So, therefore, we have a problem where we have effectively unwritten rules. Well, what do we have here of record? I'll follow you, even though I'm not particularly persuaded that you've answered my question. But I'll follow you and say, okay, where the administrative agency declares that the rules of evidence will not be enforced. Okay. Where would that appear in this record? It appears at, let's see, back at page 237 and following of the record. There is a discussion at that point on the record with citation to the administrative rules and citation to case law by the board and accepted by the hearing officer as to whether or not hearsay is admissible in administrative proceedings. And immediately after that, the hearing officer states that those documents are accepted for purposes of administrative notice. They're not made exhibits to the hearing, but they're accepted as matters of administrative notice. And you say that that would, in effect, justify the forbearance on making objections while still retaining its benefit. So that the attorneys could use that declaration as a reason not to have made an objection, but that we are to treat that evidence as if it were objective. Now, you sound skeptical about it, but I'm not. I hear what you're saying. I'm saying that on the record as a whole, there was an objection because that, first of all, there was an objection and a ruling on everything at that point. But not a standing objection. There was no request for a standing objection. At another point, there was a standing objection. Well, where is that? I'm going to have to find it, but I had it here for you. There was a standing objection to the testimony regarding Virgie's recantation. I'm going to have to find the record site. Was there a standing objection to the introduction of hearsay? No, not to the, no. No, I'm sorry. I thought you meant to the- So basically, under ordinary rules of evidence, the hearsay that does come in has to be treated as being, as if there is no hearsay impediment and only evaluated on the basis of its reliability and competency as any other evidence. With respect to, if the ordinary rules of evidence apply, that would be correct. Okay. Now, let's get to the Constitution. Okay. Where does the right of confrontation before an administrative agency preclude the use of hearsay that is otherwise reliable? Well, you have, this court has addressed that in, I believe it's the Seacrest case. No, I'm sorry, the Colquitt case. We have Colquitt. And the Illinois Supreme Court has addressed the issue in Balamoral Racing Club versus Illinois Racing Board, and that appears at 151 Illinois 2nd, 367. In Balamoral, which involved a penalty for violating the track rules the court held, that right of confrontation does exist. And in Colquitt, the court acknowledged the property interest as being ordinarily entitled to the right to confront. But the court does not reject that to Davidson-Colquitt. Well, it says that where the, that was a student expulsion matter, and yes, there was a property interest, and of course there's a property interest here too, because a tenured teacher has a property interest in her employment. But the court in Colquitt held that where you've got the outcome of a hearing directly dependent on the credibility of witnesses, and where there is conflicting testimony, they've got a test in there. And both of those are met here. We've got our hearing officer saying the findings of fact in this matter are singularly dependent on the hearing officer's assessment of the credibility of the testimony and evidence offered. Now, where you have it, it's singularly dependent according to the hearing officer. We're meeting the first prong of Colquitt. The hearing is directly dependent on the credibility of witnesses. Secondly, it's got to be conflicting. And there can be no question here that there is widely conflicting testimony between the eyewitnesses, all of them, whether they were present and testified or not. Now, let's assume that Colquitt does touch on that, and I do have Colquitt in front of me. The next question is, what happens to the constitutional issue when there is no objection? Well, I've got two answers here, and they vary between the three charges. In the first charge, I submit to the court, the first charge is Lloyd being slotted into the fish tank. In the first charge, I submit that if you look at the record as a whole, there was an objection that was made, and the hearing officer has set up her own set of rules, which she has discretion to do under the ISB regulations, that the hearing officer has set up her own set of rules where the parties did not have to make those kinds of objections. So you're saying that there was a de facto standing objection? That's a new concept to me. No. No, it wasn't a standing objection, Your Honor. It was an objection that was made at the conclusion. She deferred her ruling on the admissibility to the conclusion of the board's case, then she moved it up so that we won't get lost in the process. She moved it up to the conclusion of another witness, and she went over and she admitted a large number of documents at that time. She asked what the objections were. Counsel made a global objection and said, I renew my previous objections. And I think in that context where you've got a hearing officer saying, I let everything in, that you've got a situation where that strict compliance as a constitutional matter, you can't waive it. Because it would be, it's just fundamentally unfair. Now, with respect to the other two charges, I maintain that there were consistent objections made all the way through to Brianna's testimony, to Virgie's testimony, to that incident report. It was admitted that the incident report and Virgie's first letter were admitted over the objection of counsel, after detailed discussion on the record. So for two of the three charges, the evidence was properly objected to, even under the formal rules of evidence that the ISBI provides don't apply here. Well, that is not my memory of the facts. My memory of the facts, as I read them in this case, was that the objections were sporadic. There were objections, at least when the evidence was introduced. But that they weren't all pervasive, as you would have liked. I don't have the specifics in front of me. But if your opponent is in agreement with me, we'll give her time on rebuttal to point that out. Well, also, with respect to the second two charges, about the hit on the back of the head to Brianna, and about the testimony about her recantation, or the charge regarding her recantation, is that once the documents came in, and they came in at the beginning, they were admitted. They were admitted into evidence. And the ensuing testimony was about those documents. They were in. I want to interject. Well, the principal testified about an incident of absence where Ms. Rule was hiding in a closet? Yes. What was Rule's testimony in regards to that? Well, what she had to say about hiding in a closet was that, and I want to say just as a threshold matter, that is not a charge. No, I understand. But there's testimony in the record, and I want to know about the principal said that this occurred. You know, this is a credibility case, and the hearing officer chose to accept the credibility of Lloyd. And, you know, when someone, a finder of fact, makes a credibility determination, they determine, based on everything they've heard and listened to, whether this person makes more sense and is more believable, or another person. So I am curious to know what Ms. Rule's response was when she testified about the earlier testimony when the principal efforts said that she went to talk to her, and she was hiding in a closet, and she said, I'm off the clock. What was Ms. Rule's, you know, interpretation of that event? Well, when you look at her testimony as a whole, what she had to say was that she had gone over for a disciplinary proceeding that day. She came back, and she informed the office that she was traumatized. She was extremely upset. Did she say she was in the closet or not? I don't think she was asking. Okay, so you don't think it's in there one way or the other. But this was the day of the actual hearing, you're saying. It was the day of the hearing. As I'm recalling the facts. There is also testimony here that Love, who occupied an office next door to Rule's classroom, was kept hearing shouting and screaming coming from Rule in her classroom virtually the entire day. Well, that's one of the reasons why it's so important to have that. That was direct testimony. I'm sorry? That was direct testimony. Yes, that was direct testimony. You objected in your brief to saying that this was not one of the charges, it was outside the charges, and it should not have been even presented. The fact of the matter is that the teacher right next door said that she felt that this Rule yelled 80 to 90 percent of the day as opposed to teaching 80 to 90 percent of the day. Well, we also had the testimony of two teachers that were actually in that classroom, one of them on a regular basis. We had the reading specialist who came in, and she was there every day working with the students who were needing some additional reading support, such as Lloyd. She was in that classroom, and she saw on a daily basis, she observed her teaching. This is a person with specialized experience, and she testified that Rule was a very good teacher, that she used effective teaching strategies, and that it was the kind of thing that would keep children engaged and involved in their work. How many times during the year was this child suspended for his behavior? Before this whole thing blew up. How many times was he suspended from that school? Is it ten? Once. He was suspended once for ten days. He was suspended one time for ten days? Before this blew up. That's right. He was suspended multiple times? The brief suggests he was suspended on more than one occasion for his behavior at that school. So you're saying no. My recollection was that the actual suspension, out-of-school suspension, because they don't have an in-school suspension at that school, the out-of-school suspension was ten days. You don't usually get to a one ten-day suspension out of school before other remedial efforts are taken, do you? No, that's right. There were other incidents. There were many incidents. Almost on a daily basis. Second graders for ten days at a time, unless there have been other less severe punishments. Yes, that's correct. And he was, and there was on a daily basis, if I'm not answering Your Honor's question. Well, yeah, I thought there was an indication that he had been suspended multiple times before the incident in which he testified the teacher, you know, pulled on his hoodie. I may be incorrect, but my recollection is that he was, that she, that Ms. Rule called the office on multiple occasions, practically on a daily basis, and that he was constantly being disciplined, and that other people who dealt with him, for example, the librarian, who dealt with him frequently, and the reading specialist as well, had the same kinds of disciplinary problems. Well, when we're dealing with the issue of the manifest weight of the evidence, you know, in terms of whether there is evidentiary support of any reasonable measure for the administrative agency's credibility calls, doesn't the evidence here of Ms. Rule's irruptibility and her erratic behavior that testified to by Ms. Love give additional credence to the Lloyd story that he was trying to contact the office to calm her down? No. Because it suggests that there was maybe some kind of propensity, but it doesn't show that that happened on that particular day. And what the evidence shows is that Lloyd's story just... Wasn't that coupled with the hiding in the closet? And also perhaps, and I'm willing to hear you on that, because there's some very questionable relevance of the earlier discipline to which Ms. Rule was subjected in 2002, with her rising from her volatility with regard to a fellow teacher, where she was warned at that time. I mean, don't... Are these factors... Are they factors that are properly on the horizon of the trier's factor in determining the credibility of the charges against her by, albeit a small child? No, I don't believe that the hiding in the closet incident, for example, is properly before... Well, it's erratic behavior, isn't it? I mean, I don't know how terribly relevant it is, and I'm not saying it's relevant at all. I'm asking... I'm saying that it wasn't charged, and yet the hearing officer draws... Well, it's not an independent charge, but is it relevant in proving the charges that were in the specs? This particular incident was used by the hearing officer to draw the conclusion that Ms. Rule had, in fact, engaged in a pattern of retaliatory behavior. I'm sorry, but you said this happened on one of the days of the hearing. Did this hearing span multiple days? I'm sorry. No, this was a pre-disciplinary hearing that I'm referring to. She'd been at a pre-disciplinary hearing, and she was very upset about it. She came back. She told the office she was upset. There were children. I believe it was Roshiana and Charisma had been disciplined, and she had stayed late with them. Ms. Rule had stayed late with Charisma and Roshiana. And the parents came in, and they said... They claimed that Roshiana and Charisma were being retaliated against because they had cooperated with Detective Wiggins' investigation. And the hearing officer concluded that, yes, that was the fact, and that that was part of a pattern of retaliation. It was one of the reasons that she upheld the third charge. So, yes, it came in as evidence with respect to the third charge. And that evidence, when it was offered by the board, was vigorously objected to by Rule counsel. What about the evidence that came in about the pressuring of the mother of Brianna to recant and pressuring her students, eight-year-olds, to write these letters in which the samples contained in the record showed that they could barely spell and barely pronounce certain common single syllabic words. Also, nevertheless, having two or three of those students use the word permission, which was interpreted as an indication that promises were made that Ms. Rule was making friendly overtures to the students by, so to speak, seeking their permission to use those letters, as further evidence that this was being pressured by Ms. Rule from her eight-year-old students. And if that was the case, does that support the third charge? Well, if we had testimony from the children as to all of the things that you've just said, Your Honor, that would be a very different story. I don't think that any of those inferences arise from the fact that she had asked the children to draft what it was that they saw. She couldn't have controlled those letters because they're ungrammatical, the spelling is incorrect, there's only one line that appears in three of the letters. Except the word permission. They couldn't spell any of these other words. They were all miraculously able to spell permission. She didn't use a word that wasn't something that was apparent, would be used because of the language that was used in the letters. That was plainly something that had to have come from another source. Is she denying outright that she asked her students to write letters? Because there seems to be some waffling about that in the treatment of that insult. No, she didn't deny that she did that. In fact, she admitted it. She said, I asked the students to write down the words. And didn't some of that take place in the presence of Brianna, where her behavior was being singled out and criticized, resulting in Brianna's becoming estranged, she called it an outcast, from her fellow students? Well, the Brianna incident occurred on December 16th. These letters were drafted on December 12th. So no, that preceded the Brianna incident. But there was another incident with Brianna. Yes, there was. And I would point out that there is no evidence anywhere. There's no evidence in the record. Your Honor's asked earlier about the evidence of the injury to Lloyd. And the answer to that is that Lloyd didn't know about these letters. There's no evidence in the record that he knew anything about those letters being drafted. And similarly, there is no evidence in the record. What about the evidence offered, albeit through hearsay, that Brianna didn't want to go to school in the morning, she was crying, she was reluctant, traced back to the treatment that she received in the school at the initiative of Miss Rule, the teacher? As I understood it, Your Honor, the thing that caused that was that Brianna, allegedly, was complaining that when she tried to ask a question, that Miss Rule wasn't responding to her, and that she told her to put her hands down. Again, we get back to this question of whether it's a hand or a head. She had to put her hands down. And then when she was, it doesn't make sense, but when she was erasing some material on her paper, supposedly Miss Rule came and hit her in the back of the head, and we don't have any evidence in the record as to how hard this so-called hit was. I mean, was it a tap, you know, to capture attention? Come on, you know, pay attention to what we're doing? Or, you know, did she bash her? We don't have anything about force. One, I don't think it's a matter of judicial notice, but any physical contact generally between teachers and students are discouraged, and any force behind any physical contact is not going to be measured by engineering tools to see how great that force is. It constitutes unlawful contact, isn't that right? And particularly when it comes to contact physicality involving somebody's head, which neurologically is more particularly vulnerable than contact with, for example, a shoulder. Well, the idea of neurological vulnerability, which I would certainly agree if there were any degree of force, but the board policy is clear when it comes to the corporal punishment that punishment implies a certain amount of force in the contact. There's no blanket prohibition on contact. No, but there's a prohibition on corporal punishment. That's correct. I mean, there is a prohibition on that. So if the fact finder determines there was corporal punishment, I don't know. I mean, that's really, I think we're kind of spending some time here on something we don't need to. I'd just like to point out that Detective Wiggins did not ask either child, or Brianna, what the level of force was. They didn't testify about it. Well, I'm sorry, Brianna didn't testify about it. Lloyd said a variety of different things. And with Brianna, we don't even know what part of the body it might have been that was involved. What are we supposed to do with the recantations of Brianna? What is your position with regard to the admissibility of those recantations? Since I presume you would contest the admissibility of the initial testimony. Now, are you taking a position with regard to the recantations? I don't think any of it should come with respect to Brianna. If, in fact, we would rule against you on that score and say that there was evidence that either a hearsay is more flexibly implemented at the administrative agency, or it was unobjected to, or there were portions of the testimony that was unobjected to, what, under those circumstances, would you tell us, would you urge with regard to the recantations? I would tell you that the recantation evidence comes via Brianna's mother, Virgie, and that the testimony is not competent. For one thing, her writings are such that oftentimes we don't even know what she's saying because the language is not clear. And in this particular instance, we have the hearing officer saying, I'm forced to conclude that, based on the available evidence, that, in fact, rule did pressure Virgie to cause the recantation. And the hearing officer is resolving the issue of the recantation based on the hearsay, and it's triple hearsay by the time we get to Virgie. She doesn't know. She's not competent. Well, the recantation both hurts you and helps you. When I asked my question, I was asking from the vantage point that it might be a system issue. How would it help us in our dealing with Brianna's testimony? What is, I'm sorry, I didn't understand that. Well, it hurts you in one way, but it also helps you, because there is a recantation of record that does conflict with the credibility of the, has relevancy, at least, in challenging the credibility of the initial statement. And the question is, to what extent would it vitiate the credibility of that initial statement? Well, we have a child. She's very young. We have a child saying that she lied. Her mother is saying that she lied. She asks for forgiveness. And I'd like to point out that much as, excuse me, with Lloyd's mother, Virgie's mother was trying to get Brianna transferred out of Ms. Rule's class. And you'll recall that Lloyd's mother, when the police were there and the police investigated the situation and gave her a police report, she said, oh, good, now I can take this to Arnie Duncan, who was the superintendent, or he was the chief executive officer at the time, to try to get that transferred. Those two children were trying to get transferred out of her class. So there was a clear motive for a falsehood. And I would submit that with this tangle of incompetent evidence in the record, that it shouldn't come in with respect to the charge against Ms. Rule, to the extent that it's exculpatory evidence, it should be considered. Anything further? A couple things. We'll give you two minutes to wrap up with some safe conduct against being questioned. I wanted to clarify that Rule's testimony, she sent a letter home on December 11th. She sent not a letter, but a report to the mother, to Lloyd's mother, documenting the different things that had happened in the class that day. They were quite explosive. She said that there were numerous, very disobedient things that the child had done, and it was reported. Then the next day, that's when the mother came back, and for about the tenth time, by her own testimony, asked for a transfer. How do we know that that letter was sent before this whole thing blew up? How do we know that from the record? We know that from Ms. Rule's testimony. We don't have a contradiction from the mother, who was the recipient of the document. Was this letter also cc'd to the principal? No. These were documents that she was preparing on a daily basis to document, pursuant to their agreement, what was going on in the classroom. They were very informal. The document that had the date changed was an e-mail. So December 11th, she sends the letter. The next day, she said, the mother comes in. She comes in. That's right. And she comes in with the allegation about supposedly being hit into the fish tank. I'd like to point out that Lloyd told the, contemporaneously, Lloyd told the social worker at the school about contacting the office by using the buzzer. He said that at the beginning. He said that at the end, that he had contacted the office. We put on a witness, who testified she was there all the time, and that she didn't get a call like that. They did not put a witness on to corroborate Lloyd that, in fact, that occurred. That is an integral part of his story from the very beginning, and it doesn't stand up to scrutiny. I have lots of other things to say, but I believe my time is up. If you have any further questions, I'd be happy to answer them. Thank you. If we limit you to five minutes, we'll wrap it up. Sure. I don't think I'll need that much. I just wanted to point out the record sites where there was no hearsay objection. Detective Wiggins testified. When he testified, rules attorney objected that he was reading from his report. He didn't testify that it was hearsay. I recall that. Virgie told Mr. Wiggins that Brianna came home and reported that rules hit her. There was no objection to that. That kind of evidence would never be admitted or allowed in any normal tribunal. For Wiggins to say that the mother said to him that the child said this, absolutely rank double hearsay would never ever be even accepted, really, by a fact finder as something you could actually pick up, hold onto, and use. It's just the most utter form of rank double hearsay. So, I mean, you say there was no objection. I guess we'll have to really scour the record to see if there was an objection to this kind of testimony. And do you agree with counsel that the hearing officer says she always lets everything in and then she figures out what she's doing later? I can cite you the record so that you don't have to scour it. No, we do. We need to because there's a serious debate here about what the record shows, what the testimony was, and a crucial issue is the manifest weight. And the only way you can truly determine whether the manifest weight supports the hearing officer's finding is to scour the record and truly review it to see whether the objections were really there or whether they weren't there or whether the hearing officer pretty much said the door is open and I'll figure it out. I'll sort it all out later. You know, fact finders don't generally kind of take that laissez-faire attitude, although I know the rules do allow. Rules of evidence don't apply. It happens in arbitration. I don't think arbitrators are allowed to exclude evidence, but that doesn't preclude that evidence from being sifted at the end of the proceeding. And I'd point out that in the Supreme Court's case in Grissom, the teacher was allowed to put in depositions that were taken outside the presence of the board's counsel. That was in the only Supreme Court case. And, Les, I just want to, because you seem to... But in a deposition, there is confrontation, right? Because it's not, it's testimony taken in the presence of the other parties. It wasn't really a deposition. What the teacher's attorney was allowed to do was put in statements that he, tape recordings that he had made outside of the presence of the board's counsel, and that was in Grissom in the Supreme Court. And just one further thing, Judge, you seem to be saying that Lloyd had a propensity to lie because of his ADHD. Well, there was some testimony to that effect. I don't take a position on what actually was the case, but there was testimony presented that because of his symptomology, making up stories was not oblique to who he was. Well, what the hearing officer found on that was there's no evidence to suggest that a 7-year-old with ADHD has any greater or lesser propensity to lie. Well, he chose not to believe that witness. Right. I just wanted to point out that I don't think there's evidence that... But on the other hand, aside, you know, without denigrating in any way, the position, the deference that ought to be paid to the administrative agency, the administrator, the hearing officer is not, doesn't, didn't purport to possess the expertise of evaluating the symptomology of this particular syndrome. Well, in order to become a hearing officer in these cases, you have to have a background, at least five years' background in the area. So she did have some expertise. But I'd ask you to affirm the court, the board's decision to dismiss her so that no other child is subjected to rules cruel and psychological... I understand that, and I certainly, as human beings, as a court, we're not precluded from having human concerns about protecting other children. But on the other hand, the school itself rejected the constant request to transfer Lloyd to another classroom. So they weren't evidently inhibited by that concern as it pertained to Lloyd. What the principal said is she knew that the teacher was entitled to due process before she was removed from the classroom. Yeah, but she didn't have to be removed. If there was evidence of the very least incompatibility, some bad chemistry here between this child and this teacher, if a teacher is, you know, that the requests for transfer were not compliant. Thank you. Well, I think that the briefs here and the arguments were superb. Both sides give us a lot to consider, and we will take this case under advisement. And there will be a decision in due course.